Estate of George H. Burr, Joseph M. d'Assern, John Belck, Cecilie Burr and Robert LeRoy, Executors, v. Commissioner.
Estate of George H. Burr, d'Assern v. Commissioner
Docket No. 3967.
United States Tax Court
1945 Tax Ct. Memo LEXIS 33; 4 T.C.M. (CCH) 1054; T.C.M. (RIA) 45364; November 27, 1945
Ferdinand Tannenbaum, Esq., 20 Exchange Pl., New York 5, N. Y., and Charles Kaufman, Esq., for the petitioners. Conway N. Kitchen, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding *34 involves a deficiency of $526,759.26 in estate tax. The issues raised by the petition and not disposed of by agreement are whether certain transfers are includible in gross estate, and the fair market value of certain stock, notes, and a participation certificate. The facts set forth in a stipulation of facts are found as so agreed to and pertinent parts thereof will be set forth in connection with findings made from other evidence. So far as practicable, findings are separated according to subject matter. Findings of Fact The petitioners are the executors of the estate of George H. Burr, who was born on February 1, 1866, and died testate on December 18, 1939, a resident of the State of New York. The estate tax return for the estate of the decedent was filed with the collector for the third district of New York. Trust-December 31, 1934 In about the fall of 1929 the decedent was worth between six and seven million dollars. Thereafter securities he held decreased in value, and in 1932 he was practically insolvent. He recovered much of his former wealth in 1933 and 1934. The decedent's wife lost a considerable amount of money and she suggested to decedent that he make up her *35 losses. The decedent desired to make up part of such losses and decided upon a trust, in order to protect the capital against dissipation, and to provide security for his wife and indirectly for himself, beyond the risks of his business of banker and broker. On December 31, 1934, the decedent executed an instrument in which he transferred to his wife, Cecilie Burr, in trust, certain securities with directions, among other things, to pay the income therefrom to herself for life. Upon her death, the trust was to terminate and the corpus thereof distributed to Joseph M. d'Assern, a son of the beneficiary by a former marriage and Marie d'Assern Parker, a half-sister of Joseph M. d'Assern, one-half to each, if living, and if either was deceased, to his or her issue, or the survivor; all subject to a power of appointment of the trustee, exercisable by will. In the event the trustee failed to exercise the power and there was no remainderman to take, the property of the trust was to become a part of the estate of the trustee. The trustee was authorized to apply to her use so much of the trust fund in reduction of the principal as she deemed advisable for her proper care and support. The *36 worth of the decedent after creating the trust was about $1,800,000. The decedent paid all of the expenses of his household and supported his wife, and it was never necessary for her to use income from the trust for that purpose. In 1933 the decedent contributed $4,229.75 to his wife. From January to September 1934 he gave her an allowance of $500 a month. In September 1934 he increased the monthly allowance to $1,000, and in June 1935 to $1,500 a month. In April 1939 the monthly allowance was increased to $1,750. The net income of the trust, all of which was distributed to decedent's wife, each year from 1935 to 1939, inclusive, was as follows: 1935, $7,366.25; 1936, $42,396.48; 1937, $22,557.59; 1938, $21,892.34; 1939, $ 23,601.95. Long Island Property. After decedent's wife recovered from an operation in 1937, she desired to have a country home. The decedent did not like to live in the country, but when he became convinced that she intended to purchase a place, the decedent decided to acquire for her the property she had selected. The decedent borrowed $30,000 from his wife to pay down on the purchase price. On or about November 1, 1937, decedent purchased a piece of *37 residential property on Chicken Valley Road, Locust Valley, Long Island, New York. for $105,000, of which decedent paid $55,000 in cash. The remainder of the purchase price was represented by an existing mortgage. Title was taken in the name of decedent's wife. In 1939, the decedent improved the property and purchased certain furnishings therefor at a total cost of $47,008.03, which amount was included in a gift tax return filed by petitioners in 1940. The improvements and furnishings became the property of decedent's wife after they were made and installed. After the improvements were made to the property, the decedent liked the place and spent nights and week-ends there in the summer, motoring to and from his office in New York City on business days. He lived at his apartment in the city during winter months. The property constituted residential property and was not operated for business. Stock and Notes of Monide, Ltd. The decedent employed Claude S. Richardson, a Canadian attorney, to organize a corporation under the laws of Canada. He formed such a corporation on July 5, 1937, under the name of Monide, Ltd., with an authorized capital of 20,000 shares of class A stock, par *38 value $10 each, and 70,000 shares of class B stock, each of the par value of $1. None of the class A stock was ever issued. Four Canadian citizens, designated by the attorney, were named directors and officers of the corporation. The charter of the corporation provided that the stock of the corporation could not be transferred without the consent in writing of the registered holders of a majority in number of the issued shares of capital stock of the corporation, except transfers resulting from death or other operation of law and to incorporators, that the stockholders of the corporation should not exceed 50, exclusive of employees, and that invitations to the public to subscribe for stock of the corporation were prohibited. The by-laws of the corporation adopted on July 7, 1937, authorized the directors to grant options with respect to unissued shares of stock of the corporation for such consideration and at such times as they might deem proper. Checks and notes of the corporation could be signed only by a director, acting with the decedent or Joseph M. d'Assern. Securities of the corporation on deposit for safekeeping could be withdrawn only upon written order of a director acting *39 with the decedent, Joseph M. d'Assern or John Belck, decedent's secretary from 1934 to the time of decedent's death. The power to acquire securities for the corporation and to sell and exercise the voting rights of securities owned by the corporation was vested in any one of the directors, acting with decedent, or Joseph M. d'Assern or John Belck. On or about July 9, 1937, Monide, Ltd., pursuant to a resolution adopted by its board of directors on July 7, 1937, and in consideration of a payment by decedent of $3,200 cash and securities of a market value on July 2, 1937, of $2,294,798.87, total $2,297,998.87, transferred to Roycan & Co., nominee of decedent, 8,994 shares of its class B stock, promissory notes in the principal amount of $2,109,004.87 and cash of $180,000, which cash the corporation had borrowed. The notes provided for interest at such rate or rates as the board of directors of Monide, Ltd., determined during each financial year, not to exceed 4 per centum per annum, and that no dividend should be declared, unless interest equal to 1 per cent per annum was paid during the financial year with respect to which the dividend was declared. The minimum interest rate of 1 *40 per centum was subsequently reduced to one-half of 1 per centum, to conform with a resolution adopted by the board of directors of Monide, Ltd., on December 18, 1937. On July 9, 1937, 400 shares of the same stock were issued to John Belck at a price of $50 a share, and two shares were issued to each of three individuals to qualify them as directors of the corporation. In making his purchase of stock, John Belck gave no consideration to the market value of the security. He deemed it advisable to have an interest in the corporation to assure him a position in the future and to give him a voice in the management of the corporation. On July 9, 1937, the directors of Monide, Ltd., authorized its president and secretary to grant to the decedent an option under date as of that day to purchase the remaining 60,600 shares of authorized class B stock at any time within 25 years, at a price of $1 a share. The resolution granting the option was never rescinded, modified, or altered. The object of decedent in having Monide, Ltd., grant him such an option was to enable him to assure himself power to properly manage the corporation, including the investment of his assets. The original directors *41 and officers of Monide, Ltd., were succeeded on July 9, 1937, by Claude S. Richardson and two other Canadian citizens, who were employed by Richardson for that purpose. Each director, the secretary and treasurer, counsel and auditor, was to receive $250 per annum for his services. On December 7, 1937, the decedent caused his nominee to endorse the 8,994 shares of class B stock of Monde, Ltd., and on December 22, 1937, he transferred the stock as follows: Cecilie Burr
2,250 shs.
Joseph M. d'Assern
2,000 shs.
Marie Parker
2,000 shs. [1]
Courtney Burr
500 shs. [2]
George H. Burr, 2nd
500 shs. [3]
Howard Courtney Burr, Jr.
494 shs. [3]
7,744
Worcester Polytechnic Institute
250 shs.
Frank Newhall Look Memorial Park
350 shs.
Lathrop Home for Aged Women
250 shs.
Billings Polytechnic Institute
150 shs.
The Salvation Army
250 shs.
1,250 These transfers were contemplated by the decedent at the time or shortly after he had the corporation organized. The transfers were made after the decedent had been informed by Belck that if he held the stock of Monide, *42 Ltd., he would be liable for income taxes on all of its income and that, under the circumstances, it would be advisable for him to give the stock to members of his family and charitable institutions. The decedent had been in the habit of making contributions to the support of his stepniece, son and grandsons. The shares transferred to decedent's wife, Joseph M. d'Assern and Marie Parker were given as Christmas gifts the night of December 24, 1937. The decedent told his wife the night he made the gifts that the stock had little value, but might become valuable. On December 14, 1937, the decedent donated to Monide, Ltd., for cancellation, notes of the face amount of $500,000, which had been issued to him. The donation was made to enable the corporation to be in a financial position to pay dividends. On April 17, 1939, the decedent purchased from Monide, Ltd., under the option granted to him on July 9, 1937, 1,100 shares of its unissued class B stock for $1,100 and caused 400 shares to be issued in favor of each of two trusts to be formed the same day, and 300 shares in favor of Helen Belck, wife of his secretary. On the same day Cecilie Burr surrendered to Monide, Ltd., 2,250 shares *43 of like stock and caused the corporation to reissue 400 shares to each of the trusts to be created, 300 shares each to Joseph M. d'Assern and Marie Parker and 850 shares to herself. On April 17, 1939, the decedent, Cecilie Burr, Joseph M. d'Assern and Marie Parker, executed an instrument, transferring to Cecilie Burr, Joseph M. d'Assern and John Belck, in trust, 1,600 shares of class B stock of Monide, Ltd., 400 shares by each individual, with directions to apply so much of the income therefrom for the maintenance, education and support of Cecile Parker, decedent's step-grandniece, then 14 years of age, as they should deem advisable until she reached 21 years of age, when she was to receive any accumulated income in the trust, and thereafter all of the income until she attained the age of 30. At that time the trust was to terminate and, subject to the existence of certain conditions, the corpus paid over to her; otherwise, the trust was to continue and the income thereof paid to her until she reached 40 years of age, when the trust was to terminate and the principal distributed to her. If the beneficiary died prior to the termination of the trust, the accumulations of unexpended *44 income and corpus were to go to such persons as would take if she were the absolute owner and had died intestate. On the same day the same individuals created a similar trust, each contributing 400 shares of class B stock of Monide, Ltd., and naming Lawrence Parker, decedent's step-grandnephew, then 10 years of age, as the primary beneficiary. The trust instrument provided that if Lawrence Parker died prior to the termination of the trust, the corpus and accumulations of income were to go to Marie Parker and Joseph M. d'Assern, one-half to each. The trusts were created at the suggestion of John Belck to give effect to a desire of the decedent that the primary beneficiaries be assured financial independence. John Belck suggested to the donors of the trusts the number of shares they should contribute. He suggested to the decedent that he contribute 800 shares in order to relieve the burden of the other contributors. The gift to Helen Belck was also made upon the suggestion of her husband. Marie Parker, mother of Cecile and Lawrence Parker, divorced her husband in about 1930, and he died one or two years later. She was a widow in 1939. The decedent was an extremely generous *45 man. He made gifts in lean as well as in prosperous years. He always enjoyed, and spent considerable time every year, selecting Christmas gifts for members of his family, and his friends and employees. After the issuance of the 1,100 shares to decedent, Monide, Ltd., had 10,500 shares of its class B stock outstanding. Thereafter and on the date of decedent's death, the shares, except 1,250 shares owned by charitable institutions, were held as follows: Relation to Decedent
Shares
Cecilie Burr
Wife
850
Joseph M. d'Assern
Stepson
1,500
Marie Parker
Step-niece
1,500
Cecile Parker Trust
Step-grandniece
1,600
Lawrence Parker Trust
Step-grandnephew
1,600
Courtney Burr
Son
500
George H. Burr, 2nd
Grandson
500
Howard Courtney Burr
Grandson
494
John Belck
None
400
Helen Belck
None
300
Directors' shares
6
On May 3, 1939, A. H. Lang, the secretary of Monide, Ltd., was of the opinion that the class B stock of the corporation had a market value on April 17, 1939, of $7.50 a share. On January 27, 1938, the decedent waived his right to receive interest of one-half of 1 per cent per annum as the holder of notes of Monide, Ltd., in the face *46 amount of $1,500,000, maturing July 8, 1942, and $37,900, maturing November 19, 1942, and consented to the payment of dividends for the year ending June 30, 1938, without the payment of such interest. Like waivers were given on June 30, 1938, respecting notes aggregating $1,460,000, maturing July 8, 1942, and $60,000, maturing June 6, 1943, and on June 28, 1939, with respect to $1,400,000 of notes, maturing July 8, 1942, $40,000 on November 16, 1943, and $20,000 February 3, 1944. On November 19, 1939, the decedent held $1,400,000 principal amount of notes of Monide, Ltd., and consented to an extension of the maturity date of the notes from July 8, 1942, to July 8, 1947. On April 17, 1939, the fair market value of the assets of Monide, Ltd., was $1,619,324.27, and its liabilities were $1,561,365.62, leaving capital and surplus equal to $6.16 a share, on the basis of 9,400 shares of outstanding stock. At the time of sale on that date of 1,100 shares of stock to decedent for $1 a share, the directors of Monide, Ltd., made no investigation to determine whether they could have obtained a better price for the stock. In response to written inquiry made by John Belck on April 7, 1942, as *47 to whether the officers of Monide, Ltd., had ever granted an option to the decedent under the resolution of July 9, 1937, on April 8, 1942, Claude S. Richardson, as president, and A. H. Lang, as secretary, after consideration of the matter, signed a letter, dated July 9, 1937, and addressed to decedent, reciting that the decedent was thereby granted a nontransferable option to purchase from Monide, Ltd., at any time during a period of 25 years from July 9, 1937, 20,000 shares of class A stock at a price of $10 a share, and 60,600 shares of class B stock at a price of $1 a share. The communication was sent to John Belck without a letter of transmittal, and Claude S. Richardson did not otherwise communicate with him in regard to the matter. After receiving the letter John Belck believed that the letter had been signed in 1937. An option is not enforceable in the courts of Canada, if issued without consideration. The officers and directors of Monide, Ltd., never bought and sold the corporation's securities on their own initiative. The officers of Monide, Ltd., received their instructions from John Belck. The securities were kept in New York, where the investment work was done by John *48 Belck. Dividends were never declared by the directors of Monide, Ltd., without instructions from John Belck. Orders for the purchase and sale of securities of Monide, Ltd., were executed by A. H. Lang, in Canada. The business policies of Monide, Ltd., were formulated by John Belck and Joseph M. d'Assern, after seeking advice from the decedent. Joseph M. d'Assern represented Monide, Ltd., on boards of directors of corporations whose stock the corporation held. At the time of his death, the decedent owned notes of Monide, Ltd., in the face amount of $830,000. At that time the notes had a value equal to their face amount. On or about May 13, 1940, Monide, Ltd., transferred all of its assets, except a cash balance of less than $2,500, to Monide, Inc., a Delaware corporation organized May 6, 1940, in exchange for all of the transferee's stock, consisting of 1,050 shares of common stock, par value $1 each, and the assumption of all of the liabilities of the transferor. Thereafter, up to April 28, 1941, Monide, Inc., purchased 3,600 shares of Monide, Ltd., stock for cash, and in June 1941 transferred the stock to Monide, Ltd., as a dividend and the shares were retired. At the same time *49 Monide, Ltd., surrendered 360 shares of stock of Monide, Inc., to Monide, Inc., for retirement and the shares were retired. Monide, Ltd., then distributed the remaining 690 shares of stock it held of Monide, Inc., to its stockholders pro rata for its own stock and paid a final dividend of $23,110.50 to its stockholders pro rata. Monide, Ltd., was then dissolved on November 17, 1941. At all times important thereafter, the stock of Monide, Inc., was held as follows: Marie d'Assern Parker
150
Joseph M. d'Assern
150
Lawrence Parker Trust
160
Cecile Parker Trust
160
Helen Belck
30
John Belck
40
Total
690
The fair market value of the assets of Monide, Ltd., on the date of decedent's death was $1,922,334.84. Its liabilities consisted of notes payable in the amount of $1,460,000 and an open account in favor of decedent for $150,056.09, leaving capital and surplus of $312,278.75, an amount equal to $29.74 a share on 10,500 outstanding shares. Prior to May 20, 1940, the open account was paid to the estate of the decedent at its face amount, and $70,000 of the notes, $40,000 due November 16, 1943, $20,000, February 3, 1944, and $10,000,000, July 8, 1947, were redeemed *50 at face amount, leaving $1,390,000 of notes, maturing July 8, 1947, outstanding on May 20, 1940. The executors of decedent's estate, as representatives of the stockholders of Monide, Ltd., directed the officers of Monide, Ltd., to redeem the $70,000 notes at par. No consideration was given at the time to the market value of the notes. Their desire was to obtain cash to enable the estate to pay some indebtedness. Sometime between June 30, 1940, and June 30, 1941, notes of $190,000 face value were redeemed at 90 cents on the dollar, and between June 30, 1941, and June 30, 1942, notes of $450,000 face value were redeemed at the same figure. Policy Contracts On August 19, 1935, the Equitable Life Insurance Co., pursuant to an application filed by the decedent, issued for a single premium of $166,212, policy No. 9872481, in the face amount of $200,000, payable upon the decedent's death to his estate. All rights under the policy were vested in the decedent during his lifetime. On August 20, 1935, the same company, upon the application of decedent, issued for a single premium of $45,788, a life annuity contract, No. 9872482, providing for annual payments to the decedent during his *51 lifetime of $4,796.56. No medical examination was required for the issuance of policy No. 9872481 and the issuance of such policy was conditioned upon the execution and acceptance of policy No. 9872482 and payment of the premiums. The premiums for both policies were paid by the decedent. Pursuant to a request made by the decedent on November 25, 1935, policy No. 9872481 was reissued as of August 19, 1935, without medical examinations, in three policies, one in the face amount of $100,000 and two each in the face amount of $50,000. The rights under the reissued policies were vested in Marie d'Assern Parker, her executors or administrators. Settlement of the death claims under the three reissued policies was made effective February 2, 1940, whereunder Marie d'Assern Parker became entitled to receive the net proceeds of the policies in the amount of $200,000, plus post-mortem dividends in the amount of $400.17. The beneficiary elected to leave the proceeds of the policies on deposit with the insurer and receive interest thereon as provided in the policies. The life annuity contract terminated with the payment made by the insurer preceding the death of the decedent and had no death *52 value. Upon the presentation of the policies to Marie Parker in 1935 by the decedent as a gift, he remarked that they would take care of her regardless of what happened. The dividends on the policies were about $1,200 a year. Facts as to Contemplation of Death The decedent was a graduate in civil engineering and an extremely able and active business man. His principal business was that of a note broker, and was one of the four largest such businesses in the United States. When in the city he maintained office hours from 10 o'clock until about 5 o'clock and held frequent conferences. He took an active interest in the affairs of corporations of which he was a director. The decedent took two vacations a year, one in the summer, when he usually went to Europe, and the other in the winter, when he would go to California, Florida, or Mexico. He worked hard and played hard, enjoyed traveling and the company of friends. The decedent led a very active social life. He never lunched alone if he could avoid it, and practically every evening had a social engagement or went to a theater. He generally played golf on Saturdays and Sundays. The decedent was optimistic, full of vitality and *53 seemed to enjoy a full life. He enjoyed parties and entertaining his friends. He liked to dance and enjoy himself in restaurants and night clubs and stayed up late at night. The decedent did not miss a day at his office during the last five years of his life on account of illness. He never discussed his health in conversation with Joseph M. d'Assern. Decedent's wife and Joseph M. d'Assern had no knowledge of any serious illness ever suffered by decedent. She never discussed decedent's health with him, and although she suggested that he. take things easy, he continued to live his customary way. The decedent was a heavy drinker and smoker until he died. He discontinued drinking and smoking at times upon the advice of his doctors, but his abstinence usually lasted no more than three or four days. He never discussed with John Belck or Joseph M. d'Assern estate or inheritance taxes payable upon his ceath. In 1932 he, though without a special complaint, consulted a physician. An examination showed a minor gouty arthritic condition resulting from dietary indiscretions. In March 1934 he complained of attacks of indigestion. The findings of the physician were not of a serious nature, *54 and the symptoms were not attributable to the heart. The recommendations of the doctor were temperance in the use of tobacco and abstinence from liquor. A similar visit was made to the same doctor in June 1934. The doctor found a coated tongue, a slightly enlarged liver and the nose and pharynx congested, and recommended less food and drinking, and less exercise. In February 1935 the decedent was examined again by the same physician, who prescribed, as the result of the visit, a vitamin tonic and recommended moderation in drinking of alcoholic beverages. The decedent consulted Dr. Craig, an ear, nose and throat specialist, at irregular intervals, commencing in 1917, when he had a cold in the head or a sore throat. In April 1937 he consulted him about a feeling of fullness in his lower throat. An examination disclosed a swelling down to the base of his tongue and between the tongue and larynx. The physician thought it might be a growth. An analysis of a section of the affected tissue was negative, as to the growth, of which finding decedent was informed, but the physician was still suspicious of the condition and referred decedent to Dr. Quick for his opinion. Both doctors decided *55 thereafter that notwithstanding the pathological report of nonmalignancy, that it would be advisable to give their patient a series of X-ray treatments to be on the safe side. The diagnosis of decedent's condition was analyzed as "cronically inflamed lymphoid tissue." Dr. Quick commenced to treat decedent in May 1937 with X-radiation. The treatments resulted in marked improvement within a week or ten days, and within a short time it was difficult for the doctor to get decedent to keep his appointments with him. By the end of July there was no evidence of the condition or the congestion caused by the heavy and prolonged radiation treatments. The decedent visited Dr. Quick about twenty times in May 1937 for treatments, twenty-one in June and nineteen in July. Thereafter, to the time of decedent's death in December 1939, the decedent visited Dr. Quick's office from one to eleven times each month. The treatments required from 15 minutes to an hour. No radiation treatments were given after August 3, 1937. Visits thereafter were made for check-ups and to keep the throat in a healthy condition. At times decedent's treatments were for a dry throat caused by the heavy radiation treatments *56 he had received. The decedent had no serious illness until his death. Dr. Quick had no knowledge that decedent was ever disturbed about his physical condition. In and after 1917 the decedent appeared to Dr. Quick to be a "pretty live, vigorous fellow." The decedent consulted Dr. Ewald about December 1937, and visited him voluntarily every two months thereafter for a check-up. An examination showed that he had a pronounced case of general arteriosclerosis, such as generally exists in all persons above 60 years of age, with sclerosis aorta and mild carditis. There was nothing exceptional about his condition. Myocarditis is an inflammation of the muscle of the heart caused by insufficient nourishment resulting from arteriosclerosis. Dr. Ewald gave decedent a complete physical examination on each visit. During that period decedent appeared to be happy, very active and wide awake, and never expressed any concern about his health. In March 1939, Dr. Carroll examined decedent at the request of Dr. Quick. He informed decedent that he was in "pretty good condition," and that if he behaved as a man of his age should, that he would live a long time. Dr. Ewald was called to visit decedent *57 the night preceding his death. He found him suffering from a typical heart attack and from his condition realized that the end was close. Decedent remarked to him that night that he "didn't expect that condition." In his last will and testament, executed on April 20, 1939, the decedent, after making certain specific bequests to his wife, son, grandsons, Joseph M. d'Assern, Cecile Parker and Lawrence Parker and other bequests, bequeathed his residuary estate as follows: 50 per cent to his wife, 10 per cent to Marie Parker, and a like percentage to Cecile Parker, George H. Burr, III, a grandson, Lawrence Parker and the Salvation Army. In 1930 Marie d'Assern Parker and her two children went to New York to live. She first lived with decedent and his wife and then with her stepbrother, Joseph M. d'Assern. The decedent commenced to contribute to the support of Marie d'Assern Parker and her children in 1930. From 1933 to 1939, inclusive, the decedent contributed a total of $28,719.88 for that purpose. Value of Stock George H. Burr & Co., Inc. At the time of his death the decedent owned 17.4 shares of the 18.7 shares of outstanding capital stock of George H. Burr & Co., Inc., a New *58 York corporation. At such time the fair market value of the assets of the corporation, including $630,000 face amount of notes of Monide, Ltd., was $1,177,021.83. Of the notes which had a fair market value of $630,000, $40,000 were due November 16, 1943, $20,000 February 3, 1944, and $570,000 July 8, 1947. The liabilities of the corporation, not including stock, were $69,282.98. The shares held by the decedent had a value for estate tax purposes of $1,030,730.24 at the time of his death. Value Participation Certificate. At the time of his death the decedent owned a participation certificate of the face amount of $18,000 in the bond and mortgage of $50,000 on the Locust Valley property. The certificates were sold in the open market. The certificates owned by the decedent had a value of $15,120 at the time of his death. Opinion The principal issue herein is whether the various transfers made by the decedent are includible in his gross estate. In his determination of the deficiency the transfers were included in gross estate under the provisions of section 811 (c) of the Internal Revenue Code at the following values: Trust, December 31, 1934
$409,184.76
Gifts to Cecilie Burr: Real estate November
1937
$ 55,000.00
Real estate and chattels,
1939
47,008.03
102,008.03
Stock of Monide, Ltd.: December 22, 1937, 7,744
shares
298,453.76
April 17, 1939, 1,100
shares
42,394.00
340,847.76 *
Policles on decedent's life
200,400.17
*59 The provisions of the statute relied upon by the respondent are set forth below. [4]
*60 Upon brief the respondent first contends that all the transfers were made in contemplation of death within the meaning of section 811 (c), as interpreted in Wells v. United States, 283 U.S. 102. Our first consideration will be limited to the transfers other than the policy contracts. Contemplation of Death In support of his determination, which has a presumption of correctness, the respondent points to numerous visits made by the decedent to physicians for physical examinations and treatments commencing in 1933 and continuing until his death in December 1939 as creating such a bodily and mental condition of the decedent that the transfers were prompted by thoughts of death; that decedent's disregard of admonitions against continued smoking and drinking as detrimental to his health, caused him to adopt a fatalistic attitude, and that such attitude prompted him to adopt and carry out a plan for the disposition of a material part of his property, with the thought of death in his mind. Much significance is also given by him to the decedent's age at the time of the transfers. In short, respondent in support of his determination, relies primarily upon decedent's health *61 and age, and disregards many other facts bearing upon the question. We do not think the medical history of decedent prior to his final illness justifies the conclusions reached therefrom by the respondent. It shows no serious illness or an ailment such as would cause a normal individual to believe that it would or might result in death. The visits decedent made to physicians prior to 1937 for medical advice were for physical check-ups or minor illnesses. Examinations disclosed no serious ailments. The doctors he consulted in April 1937 were in doubt about their diagnoses of a swelling at the base of decedent's tongue until analyses of tissue removed from the affected section showed that the condition was not cancerous or otherwise malignant. The decedent was aware of the negative character of at least one of the pathological reports, it not appearing whether he was informed of the outcome of the other analysis, and any fears he might have had about the seriousness of his condition were soon set at rest. The X-radiation treatments decedent received were given to be on the safe side. They caused early improvement and were discontinued August 3, 1937. Such treatments as he received *62 thereafter were of a routine nature. None of the physicians who examined the decedent found any other serious or unhealthy condition for a man of decedent's age. Dr. Quick, who saw decedent professionally and otherwise in and after 1917, knew of no serious illness of decedent until his death and considered him a "pretty live, vigorous fellow." As late as March 1939, Dr. Carroll thought decedent would live a long time if he observed temperance in his daily life. Throughout the period during which decedent received treatments from Dr. Quick and visits were made for periodical physical examinations, decedent continued to be actively engaged in business and pursued his customary social life. This conduct is opposed to any idea that decedent entertained thoughts of death at that time. We agree with the respondent that the opinions of the physicians who were consulted by the decedent are the best evidence of his physical condition. They found no reason to believe his death would occur as the result of a known disability. The testimony of decedent's wife and close business associates, who were in a position to observe his health as indicated by the way he conducted himself during the *63 course of his daily life, corroborate the conclusions reached by the physicians. We are unable to find that thoughts of death, caused by physical ailments, actuated decedent to make the transfers. The record is replete with evidence of the generosity of decedent and his willingness to share his wealth with others closely related to or associated with him. The stock market crash of 1929 and the depression which followed it, depreciated the value of securities held by decedent to such an extent that in 1932 he was practically insolvent. The experience made him realize the advantages of placing some of his fortune in the hands of natural objects of his bounty and beyond the risks of his business. The decedent's first act was to create a trust, in December 1934, for his wife to comply with her request that he make good the losses she had suffered and to give her an independent income and indirectly to secure his own future. At that time he was giving his wife a generous allowance and paying all of his household expenses. The decedent retained no reversionary or other interest in the trust and it was never necessary for the beneficiary to use any of the trust income for her support. *64 The object of the trust has a direct connection with motives associated with life rather than with death. The motive for the purchase and gift of the residential property in Long Island is clear. The decedent's wife desired a country home and although he preferred to live in the city, when he became convinced that she intended to acquire a place regardless of his preference, he acceded to her wishes and purchased the property in question. The property was acquired for residential purposes, a motive associated with life, rather than death. The situation respecting the improvements is of the same general nature. The betterments were made to make the house a more comfortable place in which to live during the summer. The evidence, other than decedent's health, respecting the transfers of 8,844 shares of stock of Monide, Ltd., 7,744 to members of decedent's family and relatives on December 22, 1937, and 1,100 shares on April 17, 1939, to the trusts created for the benefit of Cecile Parker and Lawrence Parker, 400 shares to each, and 300 shares to Helen Belck, wife of his secretary, is ample to overcome the finding of respondent that the transfers were made in contemplation of death. *65 The gifts made in 1937 were contemplated at or about the time the corporation was formed six months earlier. The decedent had been advised of personal liability for income tax on the corporation's net income if he held the stock. To avoid such liability was probably one of his motives in making the transfers in 1937. Most of the stock was presented to the donees on Christmas eve as Christmas gifts and as the other shares were transferred into the name of the donees on December 22, we have no doubt that the decedent intended them as such gifts. He had previously during that month canceled notes of the corporation in order to place it in a financial position to pay dividends. Such action, together with the fact that he did not make notes of the corporation's representing decedent's chief equity in the corporation, the subject of the gifts discloses intent to give an income producing asset, having little value at that time, rather than securities having future value. The choice of securities is contrary to a motive to make a testamentary disposition of property. The object of the trusts created in 1939 was to insure support for the beneficiaries, minor children of Marie Parker. The *66 gifts were made at the suggestion of John Belck to carry out a desire of decedent, and to relieve the burden of other donors to the trust. The object was obviously to increase the income of the trusts, a purpose associated with life, not death. The transfer of 300 shares to Helen Belck was made by the decedent at the suggestion of her husband, and was an outright gift having no connection with death of the decedent. Under all the circumstances, we conclude that the transfers, excluding the policy contracts, were not made in contemplation of death. Retention of Possession or Enjoyment Until Death The respondent contends in the alternative that the various transfers are includible under other provisions of section 811 (c). Trust - December 31, 1934 The respondent argues that these transfers are includible in gross estate upon the ground that the decedent retained until his death "the possession or enjoyment of, or the right to the income from, the property" by reason of the provision in the trust agreement giving the beneficiary, decedent's wife, power to invade corpus for her proper care and support. The respondent says that his action is within the rationale of Douglas v. Willcuts, 296 U.S. 1, *67 and is supported by Helvering v. Mercantile-Commerce Bank & Trust Co., 111 Fed. (2d) 224. In the Willcuts case the income of the trust, held to be taxable to the grantor, was paid, in effect, under a court decree to discharge a legal obligation of the grantor for the support of the beneficiary, and in the other case relied upon by respondent, provisions of the trust agreement required the wife-beneficiary to apply a specified amount of the income upon their family and for the support of herself and her husband, the grantor. The facts here are different. The income of the trust was payable to the decedent's wife to use as she saw fit. She had power, as trustee, to invade corpus for "her proper care and support." Thus she was not compelled to use income or principal of the trust for any specified purpose so as to discharge a legal or other obligation of her husband. At all times important the decedent paid all of the expenses of his household and otherwise supported his wife and there was never any occasion for her to look to the trust for maintenance and support. Under the circumstances, the value of the corpus of the trust is not includible in gross estate upon the *68 ground that possession or enjoyment of, or the right to the income from the property was retained by the decedent until his death. Commissioner v. Douglass, 143 Fed. (2d) 961, affirming 2 T.C. 487; Wishard v. United States, 143 Fed. (2d) 704. Long Island Property The position of respondent is that the decedent retained the possession or enjoyment of this property until his death. He cites no authority to support his argument. His contention is that the decedent's occupancy of the premises as a residence is sufficient to bring the transfers within the statute. It is true that the decedent and his wife used the property as a summer home and to that extent he enjoyed the premises. The gifts were complete and after they were made, the donee had title to the real property and chattels. The decedent retained no interest of any kind in the property and such enjoyment as he had of his gifts was at the sufferance of his wife and not because of any rights he possessed in the property. Monide, Ltd., Stock The respondent argues that the transfers of Monide stock were, under section 811 (c), intended to take effect in possession or enjoyment at *69 or after death and because of a "right, either alone or in conjunction with any person to designate the persons who shall possess or enjoy the property or the income." He also argues, under section 811 (d), upon the ground that their enjoyment "was subject at the date of his death to any change through the exercise of a power * * * to alter, amend, revoke or terminate." The two contentions will be treated together. He cites no authority to support his argument. The transfers of 7,744 shares in 1937 were outright gifts, with no strings attached, and with the 1,250 shares transferred to charitable organizations, none of which 1,250 shares is in dispute here, represented all of the outstanding stock of the corporation. The 1,100 shares were acquired in 1939 for the purpose of immediately transferring them as gifts, and the intent was put into effect. The decedent did not at any time after the transfers own any of the corporation's stock and consequently was never in a position, as a stockholder, to control the corporation. It is alleged, however, that the control over and rights in the property transferred was derived from other sources. First, it is contended that through the decedent's *70 ownership of notes of Monide, Ltd., he could control the payment of dividends, and thus retained the right to designate the persons who could possess or enjoy the stock transferred and the power to "alter, amend, revoke or terminate." Such powers in the donor were no more than the rights possessed by any creditor of a corporation and did not affect the finality of the gifts or the title the donees had in the stock, or deprive the donees of their rights, as stockholders, to dividends, when earnings were available and dividends were declared. The stock was received, subject to the charge of the notes as a liability of the corporation and any rights decedent saw fit to waive as a holder of the notes, instead of depriving the stockholders of any enjoyment, etc., operated to give the corporation extra income to pass on to them by way of dividends, and gave the stockholders additional rather than less enjoyment of the stock. The corporation was under no obligation to distribute to its stockholders as dividends, any financial benefit derived from the generosity of decedent as a noteholder. The power to fix the rate of interest on the notes was in the board of directors of Monide, Ltd., *71 who were under the legal control of the stockholders. The decedent was not a stockholder of the corporation at any time after the transfers of the stock and consequently was not in a position to increase the rate of interest on the notes by legal methods. The next contention of respondent is that by reason of decedent's right to exercise an option granted to him on July 9, 1937, promptly after the organization of Monide, Ltd., to purchase all of the 60,600 unissued shares of class B stock, the decedent could obtain complete control over the corporation and by exercising such control completely destroy, or greatly diminish, the equity in the 8844 shares in controversy here by causing the corporation to pay his notes in full and prevent the other stockholders from selling their stock without his consent. The right to control by exercising the option is said to establish that the transfers were "intended to take effect in possession or enjoyment at or after his death" and gave decedent the power "to designate the persons who shall possess or enjoy the property or the income therefrom," and to change the enjoyment, which constitutes a power "to alter, amend, revoke, or terminate." *72 The parties disagree on whether the decedent had an option to purchase the stock. We have found as a fact from all the evidence that the decedent purchased 1,100 shares of the corporation's class B stock in 1939 under an option granted to him by Monide, Ltd., on July 9, 1937, and as the point is the subject of considerable discussion in the briefs of the parties, some of our reasons for our finding will be set forth. A resolution and other writings may contain all of the terms of a contract. Monarch Theatres Co. v. Helvering, 137 Fed. (2d) 588; Caroline Mills v. Commissioner, 126 Fed. (2d) 857; United States v. Hillcrest Investment Co. 147 Fed. (2d) 194. The decedent organized Monide, Ltd., and except for cash received for 400 shares of class B stock sold to John Belck, his secretary, provided all of the corporation's working capital in exchange for 8,994 shares of its 70,000 shares of authorized class B stock, each of a par value of $1. The decedent could have acquired all of the corporation's authorized stock in the transaction but, for reasons *73 not appearing of record, limited the shares to the number issued to him. The record contains no written request or offer of the decedent for the option. His secretary executed an affidavit in 1943 in which he stated that decedent decided to take an option on the stock so that he could become a substantial stockholder whenever he deemed such action necessary. An affidavit to the same effect was signed by Joseph M. d'Assern. In any event it is apparent that as the members of the board of directors were in the nature of employees of the decedent, their duties were to perform only such administrative acts during the organization of the corporation as were directed by decedent. Under the circumstances it may be inferred that the resolution was adopted in compliance with a request or offer of the decedent. The resolution recites that the president and secretary "are authorized * * * to grant to Mr. George H. Burr an option under date of the 9th day of July 1937 * * *." The resolution was adopted after an announcement had been made by Claude S. Richardson, who, with A. H. Lang, were the only directors present at the meeting, "that it had been considered desirable to grant to Mr. George *74 H. Burr an option to purchase * * *." The resolution was never rescinded or modified. We decline to follow testimony of Claude S. Richardson to the effect that he did not regard the resolution as granting an option without further action on his part, as president, and the secretary of the corporation to put it into effect. The evidence shows that he and the secretary acted under the assumption that the resolution granted an option. On April 17, 1939, the decedent purchased 1,100 shares of the stock at the option price of $1 a share and at that time the secretary was of the opinion that the stock had a market value of $7.50 a share, and the officers of Monide, Ltd., made no effort to determine whether they could get a better price than $1 a share. Such action constituted recognition by the officers of the existence of an option in favor of decedent. In 1942, after the corporation was dissolved, these officers signed a letter addressed to the decedent granting him an option as of July 9, 1937. Such action was in accordance with opinions of John Belck, and Joseph M. d'Assern that the decedent had an option when the latter purchased 1,100 shares in 1939. We think that the evidence establishes *75 that all parties concerned understood that the resolution granted the option in question. The petitioners contend that the option was not enforceable because it lacked consideration under the laws of Canada. This point is raised in spite of the fact that the corporation honored the option in 1939 to the extent of 1,100 shares and in the absence of any indication that any of the parties in interest ever questioned the existence of a valid option. It is apparent from all of the facts that the granting of the option was a part of the original transaction involving an exchange of cash and securities for stock, cash, and notes and consequently that the consideration for it included the consideration for the option. We conclude that the decedent had a valid option. It does not follow, however, that the transfers of stock were ineffective. In Reinecke v. Northern Trust Co., 278 U.S. 339, the settlor of five of the trusts involved in the case, reserved the power to supervise the reinvestment of trust funds, to direct the issuance of proxies to his nominee for voting stock held in the trust, to control all leases executed by the trustee and to appoint successor trustees. *76 Concerning these reserved powers, the court said: Nor did the reserved powers of management of the trusts save to decedent any control over the economic benefits or the enjoyment of the property. He would equally have reserved all these powers and others had he made himself the trustee, but the transfer would not for that reason have been incomplete. The shifting of the economic interest in the trust property which was the subject of the tax was thus complete as soon as the trust was made. His power to recall the property and of control over it for his own benefit then ceased and as the trusts were not made in contemplation of death, the reserved powers do not serve to distinguish them from any other gift inter vivos not subject to the tax. See Herbert Abraham, 3 T.C. 991. Such potential powers as the decedent had to obtain stock control of Monide, Ltd., were acquired in a transaction with the corporation and, accordingly, were not reserved by him in the transfers in question. Even if the option had been exercised to the extent of obtaining stock control of the corporation, the powers thus acquired would not have enabled the decedent to recall or modify in any *77 way the terms of the transfers, or given him any right, alone or in conjunction with another, to possess the property transferred, i.e., the stock, or enjoy the income therefrom. Moreover, it is clear that any exercise of a power, through exercise of the option, to secure approximately six-sevenths of the corporate stock for $1 per share, and so to dilute the stock ownership and control the corporation, would be at most an indirect control over the stock, and would be only partial, merely affecting value. The transferees of the stock, as such, would remain owners, and entitled to at least a substantial interest in the stock. Obviously, such power would not entail revocation of the transfers. We do not think such power otherwise fills the requirements of the language of section 811 (c) and (d), or warrants inclusion in the estate of the entire stock interest transferred, as here urged. The same is true of the power through ownership of notes. The language of the controlling section should not be extended so far. Petitioner's economic interest in the stock passed beyond recall when the transfers were made and, consequently, there was nothing to pass at the time of, or after, his death. *78 A similar situation prevailed in Estate of William F. Hofford, 4 T.C. 542 and 790. There the decedent, while owning all of the 2,000 shares of outstanding stock of a corporation which he had been for many years managing and continued to manage, transferred 200 shares to each of his six irrevocable trusts for the benefit of his wife, daughter and four grandchildren, respectively, and about ten days later transferred the remaining 800 shares to the trusts. The trust agreements provided that none of the stock should be sold or otherwise disposed of during the lifetime of the grantor without his written consent, and after his death, the written consent of his daughter's husband, who had been associated with decedent in managing the corporation. As part of the transaction, the corporation agreed in writing with the decedent that he should control the general management of the corporation unless and until incapacitated by illness or otherwise, for a period of ten years and thereafter until terminated by decedent, at a salary of $15,000 per annum regardless of whether he should at any time be unable to perform his duties. From these and other facts we held that the stock was *79 includible in gross estate under the provisions of section 811 (c) of the Code, which are relied upon by respondent in this proceeding. Such rights of management and control, created as a condition to the transfers of stock, did not exist here. Under the circumstances, we conclude that the transfers of real estate and chattels are not includible in gross estate under the provisions of section 811 (c) or, as to the Monide stock, under section 811 (d) of the Internal Revenue Code. In view of this conclusion, it is unnecessary to determine the value of the stock transferred. Policy Contracts. The respondent contends in the alternative that the proceeds of the policies are includible in gross estate upon the ground that they were intended to take effect in possession or enjoyment at or after the decedent's death and that he retained for his life the enjoyment of, or the right to, the income from the policies, within the meaning of section 811 (c). He relies upon Helvering v. Le Gierse, 312 U.S. 531; Estate of Cora C. Reynolds, 45 B.T.A. 44; and Goldstone v. United States, 144 Fed. (2d) 373; affirmed 325 U.S. 687 *80 (June 11, 1945). In the Le Gierse case the decedent purchased an annuity contract, naming herself life annuitant, and a life insurance policy, payable to her daughter upon decedent's death. Both were single premium policies, no physical examination was required, the life contract would not have been issued without the annuity contract, and the insured had a right to change the beneficiary. The Court, after pointing out that the two contracts must be considered together, held that the life policy was not insurance, within the meaning of section 302 (g) of the Revenue Act of 1926, but that the proceeds were includible in gross estate, under section 302 (c), as a transfer to take effect in possession or enjoyment at or after death. In Goldstone v. United States, supra, the decedent purchased two single premium contracts like the ones involved herein. The proceeds of the insurance contract were payable to decedent's wife upon his death, and if she predeceased him, to their daughters. Under the annuity contract the decedent was to receive a specified sum semi-annually for life and upon his death, his wife was to receive a fixed amount. If he survived his wife, upon his *81 death the amount was payable to the daughters, and if they predeceased him, to decedent's estate. The wife had power to assign each contract, change the beneficiaries or surrender them and receive their surrender values. In case the wife predeceased the decedent, the powers passed to him. The Court included the transfers in gross estate under the provisions of section 302 (c) of the 1926 Act because of the existence of a reversionary interest in the contracts at the time of his death. The Court did not, under the circumstances, consider it necessary to consider an alternative argument that the transfers were includible in gross estate under the same provision because the decedent actually received an annual return from the contracts during his lifetime. The decedent's right to semi-annual payments under the annuity contract was, however, referred to by the Court as a valuable interest retained by the decedent until his death. In Helvering v. Tyler, 111 Fed. (2d) 422, a case involving contracts like the ones herein, the Court, in holding that the face amount of the "insurance" contract was includible in gross estate as a transfer intended to take effect at death pointed *82 out that one of the controlling considerations was the annuity payable to the decedent until his death. Only annuity contracts were involved in Commissioner v. Wilder's Estate, 118 Fed. (2d) 281, and the Court reached the same result. This reasoning of the Court was followed in Estate of Cora C. Reynolds, supra. There the decedent transferred two of the three "insurance" policies issued in connection with an annuity contract to an irrevocable trust, with directions to collect the proceeds of the policies upon her death and thereafter pay the income from the proceeds in a specified manner. In holding that the face amount of the policies transferred was includible in gross estate as transfers "intended to take effect in possession or enjoyment at or after his death" and "under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which was not in fact and before his death (1) the * * * enjoyment of, or the right to the income from the property" within the meaning of section 302 (c) of the Revenue Act of 1926, as amended, we said, among other things: * * * By a transfer of her property to *83 the insurance company decedent obtained its agreement to return a roughly equivalent value in two interrelated stipulations. Payments tantamount to the income from the whole fund deposited were to go to her during her life. And upon her death, whenever that occurred, a fixed principal sum was to be paid to decedent's estate or designees. By parting with the latter while retaining the right to receive the income for her life, petitioner effectively designated those who would succeed to the property upon her death. She did so, perhaps in a manner so final as to be beyond her power of recall. But it remains to be decided whether that arrangement for succession accompanied as it was by retention of benefits during her lifetime, suffices to relieve decedent's estate of liability for tax upon the value of the principal. * * *. * * * The right to receive the income in the form of annuity payments was inseparable from the arrangements made with respect to disposition of the principal in the form of insurance payments. It was with a part of that indivisible contract - that relating to the remainder payable at her death - with which decedent dealt when she assigned the insurance aspect to *84 the trust. It was with respect to the balance, the life interest, that she acted when she retained for her remaining life the right to receive the annuity payments. Viewing the action taken as a whole, the effect must be that decedent made a transfer - or a series of transfers - of her property "intended to take effect in possession or enjoyment at or after his death" and "Under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death (1) the * * * enjoyment of, or the right to the income from, the property." Commissioner v. Wilder's Estate (C.C.A., 5th Cir.), 118 Fed. (2d) 281. Here, the decedent retained until his death a right to annuity payments under one of the contracts, which was inseparable from the other policies. This valuable right to income is sufficient, under the cases, supra, to bring the "insurance" policies within the meaning of section 302 (c). The petitioners contend that the postmortem dividends of $400.17 paid to the beneficiary of the contracts are *85 in no event includible in gross estate. We agree with them. The amounts represent earnings of the contracts after decedent's death and would have been paid to the beneficiary if the decedent had not died. His death gave her no rights to dividends which she had not had from the moment of the transfer of the contracts to her. Accordingly, we sustain the respondent on this issue, limited, however, to the face amount of the policies. Value Notes of Monide, Ltd. At the time of decedent's death, Monide, Ltd., had outstanding promissory notes of the face amount of $1,460,000, of which $40,000 matured on November 16, 1943; $20,000 on February 3, 1944, and the remainder of $1,400,000 on July 8, 1947. Of the notes $630,000 face amount were held by George H. Burr & Co., Inc., and $830,000 by the decedent. The notes held by the decedent were returned by petitioners for estate tax purposes at a value of $625,866.04, which amount the respondent increased to $830,000 in his determination of the deficiency. Petitioners contend upon brief that the evidence establishes a value for all of the $1,460,000 notes outstanding, of not less than $828,750, or not more than $876,000. We have not been *86 advised of the manner in which the petitioners arrive at the value of $625,866.04 reported in their estate tax return. The witness of petitioner who testified to a valuation of $828,750 arrived at his value by treating the notes as a bank would a collateral loan. Under this approach he treated the assets of Monide, Ltd., as not having value for a loan in excess of $1,240,000. This amount was then decreased by $411,250 by reason of the fact that the interest on the notes was one-half of 1 per cent instead of 5 per cent. The other witness discounted the notes 40 per cent because of their low interest rate and to allow a margin for safety, and compared the earning and dividend history of the corporation with several investment trusts. By this method he concluded that the notes had a value of 60 per cent of their face amount. The petitioners' witnesses failed to take into account the peculiar nature of the corporation. It had many of the characteristics of a personal holding corporation. At the time of its organization, its stock and notes, plus some cash, which was borrowed, was issued to the decedent for securities and a small amount of cash. The value of the securities transferred *87 by the decedent, and cash, paid by him, was equal to the cash, face amount of notes, and stock at $1 a share, received by him in exchange therefor. The board of directors of the corporation, in effect, did nothing more than execute orders given under the advice and direction of decedent, whose interests in Monide, Ltd., as a holder of its notes was at all times greater than any group of stockholders and who could at any time acquire legal control by reason of his option to acquire stock for a nominal price. Thus the decedent could, indirectly, by waiving interest, canceling notes, and otherwise administering the financial transactions of the corporation, divert income to noteholders or stockholders at his pleasure. He actually exercised some of such powers. It was never intended, in our view, that the corporation's stock and notes should be sold in an open market, and it does not appear that any of it was ever sold in that manner. The decedent, by exercise of his option to gain control of the corporation through ownership of a large majority of its stock, could have brought about the liquidation of the corporation at any time prior to his death and in such manner obtained payment *88 of his notes. (This would not enable him to recall or enjoy the stock he had previously transferred.) The artificial character of the corporation is definitely shown by the payment by the corporation, in May 1940, upon the request of petitioners, at the face amount, of $70,000 of the notes, none of which had matured, and without any regard to the value of the notes. Moreover, the value suggested by the petitioners is much less than 90 cents on the dollar, at which, some time between June 30, 1940, and June 30, 1941 (and therefore possibly within only about seven months after decedent's death) notes of $190,000 face value were redeemed. Though some time during the year beginning June 30, 1940, further notes of $450,000 face value were redeemed at the same price, we attribute little weight to that fact, as further removed from the date of death. The redemption so soon after decedent's death, of the notes of $190,000 face value, does not, however, in our opinion, prescribe a maximum value, for the notes, for at the time of decedent's death, Monide, Ltd., had assets consisting of securities of a fair market value of $1,922,334.84, and liabilities consisting of an open account payable in *89 favor of decedent in the amount of $150,056.09 and the notes in question of a face amount of $1,460,000. Thus upon liquidation there would have been sufficient assets to redeem the notes at par and an excess of about $312,000 for distribution to stockholders. We have here, in effect, a closely held and controlled situation, requiring consideration of all elements of value involved therein. Under all the circumstances, we sustain the action of respondent in including the notes in gross estate at a value of $830,000, an amount equal to their face value. Value Stock, George H. Burr & Co., Inc. The only difference between the parties with respect to the value of the 17.4 shares of stock of George H. Burr & Co., Inc., owned by decedent at the time of his death, is the value at such time of the $630,000 face amount of notes of Monide, Ltd., held by the corporation. We have found the fair market value of such notes to be $630,000. Accordingly, we sustain the respondent's finding of value for the stock, reduced, however, pursuant to a concession of respondent upon brief, to $1,030,730.24. Value Participation Certificate. In his determination of the deficiency the respondent included *90 the mortgage participation certificate in the bond and mortgage covering the Locust Valley property in gross estate at its face value of $18,000. Petitioners allege that the value of the security on the date of decedent's death was $15,120. There is evidence in the record of open market sales of the certificates during a period of less than three months after the death of the decedent. We think these sales establish the value of the security and have found a value of $15,120, based upon a sale made nearest to the basic date. Decision will be entered under Rule 50. Footnotes
1. Step-niece of decedent. ↩
2. Son of decedent. ↩
3. Grandsons of decedent.↩
*. The respondent determined that these items were also includible under the provisions of section 811 (d)↩. They will be separately considered.
4. SEC. 811. GROSS ESTATE. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States - * * * * *
(c) Transfers in Contemplation of, or Taking Effect at Death. - To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, or of which he has at any time made a transfer, by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death (1) the possession or enjoyment of, or the right to the income from, the property, or (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom; except in case of a bona fide sale for an adequate and full consideration in money or money's worth. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this subchapter; (d) Revocable Transfers. - (1) Transfers after June 22, 1936. - To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration, in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished in contemplation of decedent's death.↩